**IN THE UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

LEAH TURLINGTON, an individual,

    Plaintiff,

v.

USN OPCO, LLC, a Delaware corporation,

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Leah Turlington, by and through her attorneys, Leventhal Lewis Kuhn Taylor Swan PC, hereby submits this Complaint and Jury Demand against USN OPCO, LLC d/b/a Panoramic Health as follows:

**Parties, Jurisdiction, and Venue**

1. Plaintiff Leah Turlington ("Ms. Turlington") is an individual domiciled in Arvada, Colorado.

2. Defendant USN Opco, LLC d/b/a Panoramic Health ("Panoramic Health") is a Delaware corporation that operates in multiple states, including Colorado. Panoramic Health's principal place of business is in Tempe, Arizona.

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action is brought, in part, under 31 U.S.C. § 3730. This Court has supplemental jurisdiction over the claim asserted under Colorado common law pursuant to 28 U.S.C. § 1367 because it is so related to the claims arising under federal law that they form part of the same case or controversy.

4. This Court has personal jurisdiction over Panoramic Health because, among other things, this action arises out of events that occurred in the State of Colorado.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the unlawful conduct complained of herein arose and occurred in the District of Colorado.

## General Allegations

6. Ms. Turlington was employed with Panoramic Health as Assistant General Counsel from on or around November 13, 2023 through on or around April 8, 2024.

7. Ms. Turlington reported directly to Kimberly Shreve ("Ms. Shreve"), Panoramic Health's Chief Legal, Compliance, and Privacy Officer. Ms. Shreve and Ms. Turlington worked together previously at DaVita, and when Ms. Shreve learned that Ms. Turlington was interested in joining Panoramic Health, Ms. Shreve worked diligently to convince Ms. Turlington to join her at Panoramic Health and to convince leadership and other employees within Panoramic Health to hire Ms. Turlington.

8. Ms. Shreve convinced Ms. Turlington to depart to Panoramic Health despite knowing that Ms. Turlington would have been eligible for promotion and pay increases at DaVita had she remained.

9. Ms. Shreve promised Ms. Turlington, among other things, that Panoramic Health would provide her with quick promotion, stock option potential, and flexible work location in addition to salary as an incentive to resign from DaVita and change her employment to Panoramic Health.

10. Ms. Turlington regularly received positive feedback about her employment and never received an oral or written warning regarding her performance or conduct. In fact, Ms.

Shreve informed Ms. Turlington that she was eligible for a promotion, a significant raise, and stock options in January 2024 because Panoramic Health was so pleased with her work.

11. Although hired specifically as a healthcare regulatory attorney to provide guidance on Panoramic Health's value-based care business ventures, during her tenure, Ms. Turlington spent considerable time managing the mergers and acquisitions of Panoramic Health's wholly-owned business entities.

12. Issues first arose for Ms. Turlington when she identified a problem with Panoramic Health's contracts under the Comprehensive Kidney Care Contracting ("CKCC") program. The CKCC Program is funded by (federal) Medicare and Medicaid funds and, therefore, Panoramic Health's operations under the CKCC Program are subject to the False Claims Act (31 U.S.C. § 3729), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b), and the Stark Law (42 U.S.C. § 1395nn).

13. These federal statutes, separately and in combination, express a clearly stated public policy of protecting clients and the federal government from dishonest, fraudulent, or otherwise unlawful conduct by healthcare practitioners who benefit financially from Medicaid and Medicare funding.

14. As a participant in the CKCC Program, Panoramic Health creates separate and wholly-owned business entities to function as Kidney Contracting Entities ("KCEs").

15. The CKCC Program requires that KCEs (not just at/through Panoramic Health) be bound by Participation Agreements with the Centers for Medicaid and Medicare Services ("CMS") to be eligible for participation.

16. CMS Participation Agreements generally require a single Medical Director for each KCE, and each Medical Director must (1) be a nephrologist[1] licensed and practicing in the region in which the KCE operates; and (2) be listed in the CMS portal as the Medical Director for the KCE.

17. Panoramic Health compensates its Medical Directors for providing services. When Medical Directors receive compensation under the CKCC Program, the employing entity must ensure that the arrangement complies with the Personal and Management Services Safe Harbor to avoid Anti-Kickback Statute liability, which could ultimately result in false or fraudulent claims to the government.

18. The safe harbor requires, among other things, a written agreement outlining the Medical Director services to be provided.

19. Ms. Turlington was assigned to review and provide guidance to Panoramic Health business units on product offerings to physician practices relating to the CKCC Program. During this process, Ms. Turlington discovered that Panoramic Health was out of compliance with federal law, including the requirements described *supra*.

20. Ms. Turlington first raised the issue on or around February 29, 2024 with Ms. Shreve directly by text messages and telephone. Ms. Turlington made these reports in an attempt to stop Panoramic Health from engaging in non-compliant and otherwise potentially illegal activity under the Anti-Kickback Statute.

21. After listening to Ms. Turlington's report of Panoramic Health's legal violations, Ms. Shreve stated that she understood why Ms. Turlington was "panicked" about the issues.

---

[1] A nephrologist is a medical doctor who diagnoses and treats kidney issues.

22. On or around March 13, 2024, Ms. Turlington raised the issue to Ms. Shreve, the Chief Medical Officer, and other members of the value-based care business unit per Ms. Shreve's direction of Ms. Shreve. On that call, Ms. Shreve downplayed the risk of the legal violations Ms. Turlington had identified and proposed solutions that were wholly inadequate to mitigate the CMS issues Ms. Turlington raised. While laying out her ideas, Ms. Shreve revealed that she fundamentally misunderstood and/or was apathetic about crucial aspects of the Anti-Kickback Statute and the CMS compliance issue. This deep misunderstanding is especially troubling because as Panoramic Health's Chief Legal, Compliance, and Privacy Officer, Ms. Shreve is tasked with overseeing compliance matters. Ms. Shreve's ignorance of and/or disregard for these laws created serious legal exposure for Panoramic Health.

23. Ms. Turlington, concerned about the extraordinary risk to Panoramic Health if it undertook the course of action outlined by Ms. Shreve, first obtained outside legal advice from Panoramic Health's long-time outside counsel.

24. Having spoken with Ms. Turlington prior to her original February 29, 2024 report to Ms. Shreve regarding the CMS compliance concerns, Kaydee Ochs, a Regulatory Program Manager with Panoramic Health's compliance team, reached out to Ms. Turlington on or around March 14, 2024 to discuss the CMS compliance issue Ms. Turlington had reported. During this call, Ms. Ochs stated that while she agreed with Ms. Turlington and shared her compliance concerns on the relevant issue, Ms. Shreve was very upset at Ms. Turlington for raising the issue and stated to Ms. Ochs that because of the CMS issue, Ms. Turlington "might not be a good fit" for Panoramic Health.

25. Ms. Shreve soon thereafter reached out to CMS directly to inquire about the compliance concerns Ms. Turlington raised. CMS's response from on or around March 25, 2024 supported Ms. Turlington's analysis and the plan she had put forth on or about March 13, 2024.

26. In the approximately two weeks between March 13 and March 25, 2024, Ms. Shreve was unusually cold and distant toward Ms. Turlington, barely speaking to or interacting directly with her at work. It was common knowledge within the legal department that Ms. Shreve was angry with Ms. Turlington for raising the CMS compliance issue.

27. On or about March 27, 2024, Ms. Shreve held a conference call with Ms. Ochs and Ms. Turlington about CMS's response to Ms. Shreve's inquiry about the Participation Agreements. Ms. Shreve refused to admit that Ms. Turlington was correct but outlined a remediation plan that was substantively identical to Ms. Turlington's suggestions. It was clear to both Ms. Turlington and Ms. Ochs that Ms. Shreve was furious with Ms. Turlington about her protected activity during this meeting, even though (or, more likely, *because*) Ms. Turlington was correct and Ms. Shreve provided egregiously wrong legal advice to Panoramic Health.

28. Over the next several days, Ms. Turlington continued to receive the cold shoulder from Ms. Shreve, so she began to fear for her job.

29. On April 8, 2024, Ms. Shreve called a meeting with Ms. Turlington and another member of the Panoramic Health legal team, Jyoti Raval. During this phone call, Ms. Turlington was terminated without warning. When Ms. Turlington asked Ms. Shreve why she was being terminated, Ms. Shreve confirmed that Ms. Turlington's termination was directly related to "the CMS thing" and that Ms. Shreve's negative view of Ms. Turlington's work had begun over the last "four to six weeks."

30. Ms. Shreve's admission was remarkable, since Ms. Turlington was terminated roughly five and half weeks after she first privately raised the compliance issue to Ms. Shreve by telephone and three and a half weeks after the March 13, 2024 meeting with Panoramic Health leadership and the client.

31. Initially, Ms. Shreve described the reason for Ms. Turlington's termination as "without cause," making clear repeatedly to Ms. Turlington that cause is not required under Colorado law, but then later Panoramic Health changed its answer to "poor performance" when questioned by the Colorado Unemployment Insurance office. In reality, Panoramic Health changed its reason for termination because neither explanation provided was accurate: Ms. Turlington was terminated in retaliation for engaging in protected activity. This violated federal law and Panoramic Health's own anti-retaliation policies (which Ms. Shreve herself implemented).

**First Claim for Relief**
**(Retaliatory Discharge – 31 U.S.C. § 3730)**

32. The preceding paragraphs are incorporated as if set forth in full herein.

33. At all times during this controversy, Ms. Turlington was employed by Panoramic Health.

34. Pursuant to her duties as Assistant General Counsel, Ms. Turlington evaluated Panoramic Health's CKCC Program participation to ensure compliance with federal law.

35. Under the CKCC Program, Panoramic Health's KCEs regularly received large quantities of (federal) Medicare and Medicaid funding. Through the administration of her duties, Ms. Turlington discovered that certain required components of Panoramic Health's CKCC Program violated the requirements of the CMS program as described *supra*.

36. The compliance issues Ms. Turlington uncovered created the possibility that Panoramic Health and/or its KCEs could violate the False Claims Act, the Anti-Kickback Statute, and the Stark Law.

37. Where, as here, violations of the Anti-Kickback Statute and the Stark Law can lead to potential false or fraudulent claims for payment from Medicare and Medicaid, the violating entity is exposed to False Claims Act liability.

38. Ms. Turlington reported a serious risk of non-compliance under all three laws, most specifically the Anti-Kickback Statute, to Panoramic Health through Ms. Shreve on or around March 13, 2024.

39. Ms. Turlington did so pursuant to the reasonable belief that Panoramic Health already was, or imminently would be, in violation of federal statutes and Panoramic Health's Participation Agreement with CMS. Ms. Turlington made these reports in an attempt to stop Panoramic Health from engaging in fraudulent and otherwise illegal activity to claim unlawful payments from the government.

40. Panoramic Health was on actual notice that Ms. Turlington's report was reasonable and accurate because of advice received by Panoramic Health directly from CMS on or around March 25, 2024 that supported Ms. Turlington's analysis.

41. It was widely known that Ms. Shreve was angry at Ms. Turlington for reporting this issue in part because Ms. Shreve all-of-a-sudden questioned Ms. Turlington's "fit" at Panoramic Health during conversations about the CMS issue with other Panoramic Health employees.

42. Ms. Shreve told Ms. Turlington that, due to her stellar performance, she was eligible for a promotion and a pay increase. Yet shortly after first raising the CMS issue, Ms. Turlington was terminated purportedly without cause on April 8, 2024.

43. Instead, Ms. Turlington was terminated in retaliation for engaging in protected activity, specifically for making an internal report about a reasonable compliance concern implicating the statutes discussed *supra*.

44. Even if Ms. Turlington's reports of potential violations were insufficient on their own to support an independent cause of action, Ms. Turlington's report of Anti-Kickback Statute violations triggers the same protections from the False Claims Act per federal law.

45. Ms. Turlington suffered damage as a result of her retaliatory discharge by Panoramic Health in an amount to be proven at trial for which Panoramic Health is liable.

**Second Claim for Relief**
**(In the Alternative - Wrongful Termination in Violation of Public Policy)**

46. The preceding paragraphs are incorporated as if set forth in full herein.

47. During the course and scope of her employment with Panoramic Health, Ms. Turlington raised concerns about Panoramic Health's violations and/or potential legal violations.

48. These concerns included reports that portions of Panoramic Health's CKCC Program did not comply with requirements under federal law and the terms of Panoramic Health's Participation Agreement with CMS, including the Anti-Kickback Statute (42 U.S.C. § 1320a-7b), and the Stark Law (42 U.S.C. § 1395nn).

49. Ms. Turlington's activity in raising these legitimate concerns involved an exercise of statutory, regulatory, and/or rule-based rights related to the public welfare.

50. Ms. Turlington's activity involved the performance of a public duty relating to her basic responsibilities as a citizen and an exercise of important work-related rights and/or privileges.

51. The proper use of tens of million of dollars of governmental funds in the healthcare industry is a clear mandate of public policy for the purpose of establishing a claim for wrongful termination in violation of public policy.

52. The regulation of incentive-based physician and clinic fee arrangements is a clear mandate of public policy for the purpose of establishing a claim for wrongful termination in violation of public policy.

53. Specifically, 31 U.S.C. §§ 3729 and 3730 state that it is unlawful to knowingly cause a false or fraudulent claim for payment to the federal government and to retaliate against employees who report suspected false claims. In fact, Section 3730 goes so far as to allow for citizens who bring *qui tam* actions on behalf of the government to recover part of the award should their suits prove successful.

54. Additionally, 42 U.S.C.A. § 1320a-1 outlines the public policy underlying the Anti-Kickback Statute, stating, "[t]he purpose of this section is to assure that Federal funds appropriated under subchapters XVIII and XIX are not used to support unnecessary capital expenditures made by or on behalf of health care facilities which are reimbursed under any of such subchapters."

55. Finally, the Stark Law (42 U.S.C. § 1395nn) governs physician referrals with minute detail to prevent medical practitioners and facilities from making material decisions for vulnerable patients based on unknown, undisclosed financial incentives rather than the best interest

of the patient. The Stark Law reaches into every corner of medical administration and confirms the government's conclusion that such protections are necessary for the public welfare.

56. By enacting the above provisions, the federal government has confirmed that prevention of false claims in the healthcare sector is an issue of public concern.

57. Through its employees, Panoramic Health was on actual notice that Ms. Turlington had engaged in protected activity. Minimally, Panoramic Health reasonably should have been aware that Ms. Turlington had engaged in protected activity.

58. Panoramic Health retaliated against Ms. Turlington by terminating her employment for engaging in protected activity.

59. Ms. Turlington suffered damage as a result of her wrongful termination by Panoramic Health in an amount to be proven at trial for which Panoramic Health is liable.

WHEREFORE, Ms. Turlington respectfully prays this Court (1) award damages in an amount to be proven at trial; (2) award Ms. Turlington her attorneys' fees and costs of this action as provided by applicable law; and (3) award such other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted this 9th day of May, 2024.

> /s/Andrew E. Swan
> Andrew E. Swan
> Keslie R. Cooper
> LEVENTHAL | LEWIS
> KUHN TAYLOR SWAN PC
> 24 South Weber Street, Suite 205
> Colorado Springs, Colorado 80903
> Telephone: (719) 694-3000
> Email:    aswan@ll.law
>           kcooper@ll.law
>
> *Attorneys for Plaintiff*

11